UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
          :
UNITED STATES OF AMERICA     :
          :   ECF
   - v -         :
          :   19 Cr. 832 (ER)
LUIS MERCED,          :
WILLIAM SKINNER, and      :
DORIAN BROOKS,         :
   a/k/a "Kool-Aid,"       :
          :
       Defendant.     :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

                                       DAMIAN WILLIAMS
                                       United States Attorney for the
                                       Southern District of New York

Andrew K. Chan, Adam S. Hobson, Frank J. Balsamello
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ............................................................................................................. I

**PRELIMINARY STATEMENT** ............................................................................................... 1

**ARGUMENT**............................................................................................................................. 1

    I.    EVIDENCE AND TESTIMONY ABOUT THE DEFENDANTS' PARTICIPATION IN ACTS OF VIOLENCE, GUN POSSESSION, DRUG POSSESSION, AND POSSESSION OF DRUG PROCEEDS ARE ADMISSIBLE ................................................................................... 1

    II.    EVIDENCE AND TESTIMONY ABOUT THE DEFENDANTS' CONTINUING PARTICIPATION IN DRUG TRAFFICKING IS ADMISSIBLE............................................ 16

**CONCLUSION** ....................................................................................................................... 18

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to the motions *in limine* of Defendants Luis Merced, William Skinner, and Dorian Brooks, a/k/a "Kool-Aid." All of the motions are meritless and should be denied; and as noted below, *see infra* note 1, with respect to two specific murders, the Government no longer intends to introduce testimony or evidence, so defense motions to preclude can be denied as moot. In summary, the Government submits the following:

1. An essential element of the murder charge in this case is that the defendants committed the murder "while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21" (*i.e.*, a narcotics conspiracy involving more than five kilograms of cocaine or 280 grams of crack cocaine). Testimony and evidence about Merced's, Skinner's, and Brooks's participation in such a conspiracy—including through acts of violence, gun possession, drug possession, and possession of drug proceeds—are therefore admissible, and in fact *necessary*, as direct evidence of the sole charge in the Indictment. Moreover, even if analyzed under Federal Rule of Evidence 404(b), such testimony and evidence are admissible for several proper purposes.

2. Testimony and evidence about Merced's, Skinner's, and Brooks's participation in continuing criminal activity with the Government's witnesses postdating the charged murder and narcotics conspiracy is also admissible under Federal Rule of Evidence 404(b).

**ARGUMENT**

**I.  EVIDENCE AND TESTIMONY ABOUT THE DEFENDANTS' PARTICIPATION IN ACTS OF VIOLENCE, GUN POSSESSION, DRUG POSSESSION, AND POSSESSION OF DRUG PROCEEDS ARE ADMISSIBLE**

At the outset, all of the defendants seek to preclude evidence and testimony about acts of violence, gun possession, and the possession of drugs and drug proceeds that they engaged in

during and in furtherance of their participation in the narcotics conspiracy that is *an essential element* of the murder count charged in the Indictment.  This narcotics conspiracy (the "drug trafficking organization" or "DTO"), included the following incidents, as described in a letter sent to defense counsel on October 28, 2021 (the "October 2021 Enterprise Letter"):[1]

- In or around 1986, members of the DTO retaliated after a rival committed a gunpoint robbery of Defendant William Skinner.  Members of the DTO, including Defendant William Skinner, went to the rival's home in the vicinity of either Macon Street or MacDonough Street between Marcy Avenue and Tompkins Avenue in the Bedford-Stuyvesant neighborhood of the Brooklyn and fired shots at the rival's house. (October 2021 Enterprise Letter ¶ 1, amended by a letter sent to defense counsel on November 29, 2021 (the "November 29, 2021 Enterprise Letter")).

- In or around 1987, members of the DTO, including Defendant William Skinner, participated in the robbery of an individual who was selling guns.  During the robbery, approximately four guns were taken from the victim.  (October 2021 Enterprise Letter ¶ 2).

- On or about February 25, 1988, Defendant Luis Merced and other members of the DTO were arrested in the vicinity of 12 Kingston Avenue in Brooklyn, New York after being found in possession of approximately 205 vials of crack cocaine and a beeper.  (October 2021 Enterprise Letter ¶ 3).

- In or around 1989, Defendant Dorian Brooks and other members of the DTO shot at a group of robbers who attempted to rob the defendant and other members of the DTO. One of the robbers was killed after being shot multiple times in the head and chest. (October 2021 Enterprise Letter ¶ 5).

- On or about February 6, 1989, Defendant Dorian Brooks and other members of the DTO shot and killed Lawrence Monroe in the vicinity of 5047 Drake Place SE in Washington, D.C.  (October 2021 Enterprise Letter ¶ 6).

---

[1] The October 2021 Enterprise Letter also described a September 1988 murder of a victim named Kevin Council (the "Kevin Council Murder").  (October 2021 Enterprise Letter ¶ 4). Additionally, Defendant Luis Merced requested to preclude evidence in the Government's case-in-chief relating to his participation in the murder of a victim named Terrell Lee in or around 1991, which resulted in a conviction for Murder in the Second Degree and related offenses in or around May 1992 in state court in Maryland (the "Terrell Lee Murder").  The Government no longer intends to present evidence in its case-in-chief relating to the Kevin Council Murder or the Terrell Lee Murder, so these portions of the defendants' motion can be denied as moot.  The Government reserves the right to cross-examine the defendants relating to these incidents if they testify at trial.

- On or about February 18, 1989, Defendant William Skinner was arrested by officers with the Metropolitan Police Department ("MPD") in Washington, DC, who observed Skinner throw approximately five plastic bags containing a white rock-like substance into a water puddle in the vicinity of the 5000 block on E Street SE between Drake Place and E Street. The MPD officers field tested the plastic bags, which tested positive for the presence of cocaine. During a search following the arrest, the MPD officers recovered $544 in United States currency from Skinner's coat pocket. Skinner told the MPD officers that his name was "William Johnson." (October 2021 Enterprise Letter ¶ 7).

- On or about March 8, 1989, law enforcement agents seized approximately $23,500 in cash from Defendant Luis Merced in the vicinity of the Washington National Airport in Washington, D.C. (October 2021 Enterprise Letter ¶ 8).

- On multiple occasions during the late 1980s and early 1990s, the defendants and other members of the DTO possessed and sold large quantities of crack cocaine, powder cocaine, and marijuana in the New York City metropolitan area, Washington, D.C., Virginia, Maryland, and California, and possessed firearms in furtherance of their drug trafficking operations. (October 2021 Enterprise Letter ¶ 9).

The defendants argue that these incidents are unrelated to the charge in this case and constitute inadmissible propensity evidence. The defendants are wrong. It is clear that all of the incidents listed above are direct evidence of the charge in the Indictment because they are overt acts in furtherance of the narcotics conspiracy that is an essential element of the charged violation of 21 U.S.C. § 848(e) (punishing conduct relating to continuing criminal enterprises).[2] Alternatively, the incidents are admissible under Federal Rule of Evidence 404(b) for a host of non-propensity reasons.

### A. Applicable Law

It is well settled in the Second Circuit that "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States*

---

[2] Title 21, United States Code, Section 848(e) creates a separate crime for "any person engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual, and such killing results."

3

*v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (quotation marks and alterations omitted); *see also United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) ("Where, as here, the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." (quotation marks omitted)); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("explaining that [a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged."). Additionally, "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Aref*, 285 F. App'x 784, 791 (2d Cir. 2008) (quoting *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)); *see also United States v. Lopez*, 572 F. App'x 1, 3 (2d Cir. 2014) (approving district court's decision "to allow evidence of the uncharged murder as direct evidence" of the existence of the charged narcotics conspiracy).

Even where a particular act cannot be described as an overt act in furtherance of a conspiracy, the Second Circuit has held that "evidence of uncharged criminal activity is not considered other crimes evidence under Rule 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (explaining that evidence of other acts is admissible to "provide background for the events

4

involved in the case" and "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

For these reasons, the Second Circuit and other courts have repeatedly held that acts of violence in furtherance of a narcotics conspiracy are admissible as direct proof of the existence of the conspiracy and the defendant's participation in the conspiracy. *See United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (recognizing that "[b]ecause narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force" and "advancing the aim of a narcotics conspiracy can involve performing ancillary functions such as . . . enforcing discipline and chastising rivals" (quoting *United States v. Soto–Beníquez,* 356 F.3d 1, 18 (1st Cir. 2003)); *United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) (noting that "drug trafficking is often attended by violence"); *United States v. Gadsen*, 300 F. App'x 108, 110 (2d Cir. 2008) ("[T]estimony about violent acts and firearm possession during or around the time of a narcotics conspiracy appropriately established Gardsen's conduct during the charged conspiracy" (citing *United States v. Estrada*, 320 F.3d 173, 183 (2d Cir. 2003)); *United States v. Barrett*, 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011) ("Acts of violence are frequently deemed to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged distribution conspiracy."); *United States v. Khan*, 591 F. Supp. 2d 202, 205 (E.D.N.Y. Dec. 15, 2008) ("Intimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies and these uncharged acts demonstrate defendant's alleged leadership role.").

The Second Circuit has also stated that a defendant's participation in acts of violence against rival drug dealers is proof that the defendant "knew not only the nature of the drug conspiracy, but knew also that carrying out the [violence] would advance its goals." *Santos*, 541

F.3d at 72-73; *see also United States v. Abdalla*, 346 F. Supp. 3d 420, 427 (S.D.N.Y. 2018) (explaining that acts of gun violence "may be used to establish Defendants' opportunity to access and use firearms in furtherance of drug crimes"); *United States v. Barnes*, 560 F. App'x 36, 41 (2nd Cir. 2014) (summary order) (statement by defendant about killing a rival drug dealer who had intruded on his drug territory was not Rule 404(b) evidence but "direct proof of the charged crack conspiracy and of [defendant]'s firearms possession related to that conspiracy" and "highly probative"); *Concepcion*, 983 F.2d at 392 (defendant's offer to kill a drug rival was admissible to show whether co-conspirator was a member of the alleged conspiracy with defendant and to show the defendant's "concern for the Organization's retail operations and the lengths to which [the defendant] would go to defend them").

Likewise, the Second Circuit has "long recognized the connection between drug trafficking and firearms, repeatedly permitting firearms into evidence as proof of narcotics conspiracies because drug dealers commonly keep firearms on their premises as tools of the trade." *United States v. Mitchell*, 328 F.3d 77, 83 (2d Cir. 2003) (quoting *United States v. Becerra*, 97 F.3d 669, 671-72 (2d Cir. 1996)). It is also well-established that evidence of a defendant's possession of drugs and large quantities of cash are admissible to prove the existence of a conspiracy and the defendant's participation in that conspiracy, even if it is merely circumstantial evidence of the charged offenses. *See United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir. 1991) (finding that seizure of $4,763 in cash from defendant "tended to demonstrate that he was a major drug dealer"); *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (explaining that the Government may "prove the defendant's knowing participation in a conspiracy through circumstantial evidence," including "defendant's association with conspirators in furtherance of the conspiracy; his presence at critical stages of the conspiracy that

cannot be explained by happenstance; or his possession of items that are of essential significance to the conspiracy" (internal citations omitted)); *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (explaining that "conspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence"). Indeed, even "[n]arcotics and tools of the narcotics trade seized *after* the termination of a conspiracy are admissible to prove the prior existence of the conspiracy." *United States v. Townsend*, 2007 WL 1288597, at *3 (quoting *United States v. Bermudez*, 526 F.2d 89, 96 (2d Cir. 1975) (emphasis added)); *see also United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) (finding that evidence of defendant's possession of narcotics records and narcotics paraphernalia was "relevant to the charged conspiracy . . . even if it relates to transactions outside the scope of the indictment" and was "also probative of [the defendant]'s intent and state of mind to engage in the narcotics trafficking that was charged").

      Finally, other-acts evidence is subject to the balancing test set forth in Federal Rule of Evidence 403. Nevertheless, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *Roldan-Zapata*, 916 F.2d at 804; *see also United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("[T]he evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction."); *Paulino*, 445 F.3d at 223 (finding no Rule 403 violation where prior conviction was not more inflammatory than the charged crime, the government did not place improper emphasis on the prior conviction, and the district court provided a limiting instruction); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."); *United States v. Everett*, 825 F.2d

658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony." (internal citations omitted)).

### B. Discussion

#### 1. The Evidence is Admissible as Direct Proof of the Existence of the Conspiracy that Is an Essential Element of the Charged Murder

Applying the principles set forth above, the Court should allow the jury to receive evidence at trial regarding the defendants' participation in acts of violence, gun possession, and drug trafficking that are overt acts in furtherance of the very narcotics enterprise that the Government must prove, beyond a reasonable doubt, existed and was furthered by the charged murder. At trial, multiple cooperating witnesses will testify that the defendants were part of a DTO that distributed large quantities of powder cocaine and crack cocaine in both New York City and Washington, D.C. during the 1980s and early 1990s. Members of the DTO initially sold drugs in the Bedford-Stuyvesant neighborhood of Brooklyn and then began transporting drugs to Washington D.C., where the street prices for the drugs were much higher. Witnesses at trial will testify that the DTO's territory in Washington, D.C. was in the southeast part of the city, in the vicinity of the Eastgate Gardens Housing Projects (known as "Eastgate") and the Benning Terrace Housing Projects (known as "Simple City"). Cooperating witnesses will also testify that the Washington, D.C. area was a place for members of the DTO to hideout from law enforcement or "lay low" from retaliation and law enforcement after committing acts of violence in New York City. Cooperating witnesses will further testify that the DTO regularly obtained drugs by committing robberies of other drug dealers, and the DTO carried guns for protection and to commit acts of violence against people who threatened or interfered with their drug business. All of the incidents described above in the October 2021 Enterprise Letter are

8

powerful and direct evidence of the existence of the DTO and the knowing and intentional participation of each defendant in the DTO.

For example, the Government anticipates presenting several acts of violence relating to William Skinner and Dorian Brooks—all of them are overt acts in furtherance of the narcotics conspiracy. In or around 1986, a rival committed a gunpoint robbery of Skinner in the DTO's territory. In retaliation, members of the DTO, including Skinner, fired shots at the rival gang member's home. (October 2021 Enterprise Letter ¶ 1, amended by November 29, 2021 Enterprise Letter ¶ 1.) A cooperating witness will testify about how members of the DTO assisted Skinner in retaliating because Skinner was a member of the DTO. Additionally, members of the DTO wanted to deter the rival from committing any other robberies of DTO members in the future. Similarly, Dorian Brooks participated in two fatal shootings in Southeast Washington, D.C.—both of them with other members of the DTO and to protect the DTO's operations. A cooperating witness will testify that one murder happened because a customer of the DTO owed money for a previous transaction of drugs and refused to pay, after which the cooperating witness, Brooks, and others shot and killed the victim. The same cooperating witness will testify that he, Brooks, and others shot and killed a rival drug dealer who attempted to rob members of the DTO. Both incidents occurred in the vicinity of the Eastgate Gardens Housing Complex—in the heart of the DTO's territory in Washington, D.C. (October 2021 Enterprise Letter ¶¶ 5-6).[3]

Cooperating witnesses will testify about how acts of violence like these helped to protect the DTO's territory and to eliminate threats to the DTO's operations. Without the evidence of

---

[3] The Government more fully described these incidents in its motions *in limine* and hereby incorporates by reference the facts and arguments in its motion. *See* Docket No. 79 at 10-14.

9

such violence, the jury could be left with the misimpression that Brooks and Skinner were not actively participating in the DTO at the time of the Cardenas Murder, did not have a meaningful relationship with other members of the DTO, and/or did not participate in the Cardenas Murder to further the goals of the DTO.  *See United States v. Cedeno*, 756 F. App'x 24, 26 (2d Cir. 2018) (summary order) (finding that defendant's participation in prior shootings was inextricably intertwined with charged murder-for-hire counts because of relationship with charged murder and finding two other shootings unrelated to the murder were admissible evidence of defendant's participation in the drug conspiracy); *Estrada*, 320 F.3d at 183 (holding that the use of violence and firearms can be considered "overt acts" in a narcotics conspiracy).

Similarly, the evidence of specific incidents of gun possession and drug trafficking by the defendants are admissible as overt acts in furtherance of the conspiracy and powerful proof that the defendants knowingly and intentionally participated in the DTO's drug operations.  Multiple witnesses will testify about the key role that guns played in the DTO's operations for protection and to conduct acts of violence on behalf of the DTO.  As a result, members of the DTO were constantly looking for opportunities to obtain more guns.  Indeed, a cooperating witness will testify that this motive for acquiring more guns was the reason why Skinner and the cooperating witness conducted the robbery of a gun dealer described in the October 2021 Enterprise Letter ¶ 2.  *See United States v. Muniz,* 60 F.3d 65, 71 (2d Cir. 1995) ("[T]here are innumerable precedents of this court approving the admission of guns in narcotics cases as tools of the trade." (collecting cases)).

Finally, it borders on the frivolous to argue that evidence of the defendants' possession of drugs and drug proceeds is somehow inadmissible in a trial where the Government *is required to prove* the defendants' participation in a conspiracy to possess and distribute drugs.  With respect

10

to the February 1988 arrest described in October 2021 Enterprise Letter ¶ 3, Defendant Luis Merced was arrested in possession of over 200 vials of crack cocaine and a beeper in the vicinity of 12 Kingston Avenue—one of the buildings where cooperating witnesses will testify that the DTO sold drugs in Brooklyn.  At the time of the arrest, Merced was with Raymond Cheeks—who cooperating witnesses will identify as a member of the DTO.[4]  Similarly, Merced's possession of over $23,000 in cash hidden in his coat and pants in March 1989—which he was attempting to transport from Washington, D.C. to New York City—also is strong circumstantial evidence of Merced's involvement in the DTO.  Multiple cooperating witnesses will testify about how drugs were transported from New York City to Washington, D.C., and drug proceeds, often totaling tens-of-thousands of dollars, were taken back to New York and used to resupply.  (October 2021 Enterprise Letter ¶ 8).  Finally, Skinner's arrest on February 18, 1989—just eight days after the Cardenas Murder—in the vicinity of the Simple City housing projects with a quantity of crack cocaine and cash is clear evidence of his membership in the DTO and the existence of a conspiracy to sell crack cocaine at the time of the Cardenas Murder.  (*See* October 2021 Enterprise Letter ¶ 7).  Given that the Cardenas Murder involved the robbery of a large quantity of drugs from the victim of the murder, Skinner's possession of drugs and a quantity of cash just a few days later is also proof of his participation in the murder and is inextricably intertwined with the narrative of the Cardenas Murder.  *See United States v. Mathis*, 2005 WL 8157480, at *3 (E.D.N.Y. Jan. 31, 2005) ("finding that evidence of arrests involving drug possession and gun possession of the defendant and co-conspirators is "highly probative of the

---

[4] Merced suggests that retired NYPD Police Officer John Milano—who was the arresting officer during this February 1988 arrest—is deceased.  *See* Merced Motions *in limine*, at 6.  Merced is wrong, and his motion refers to an obituary for a different officer named "John Milano" who died earlier this year.  The "John Milano" who arrested Merced and Cheeks in February 1988 is still alive and is expected to testify at trial in this case.

11

existence of the conspiracy and of [the defendant's] membership in that conspiracy" and rejecting argument that the arrests were "discrete acts" because the jury could decide whether the incidents related to the conspiracy or not). None of these incidents are being presented to the jury as impermissible propensity evidence. Rather, the jury should be entitled to consider these individual incidents as proof of the existence of the narcotics conspiracy and the participation of each defendant in that conspiracy. *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (explaining that "a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy" (internal citation omitted)); *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) (explaining that participation in a criminal conspiracy "may be established entirely by circumstantial evidence"). Without such evidence, the jury will be left with the gross misimpression that the Government's only evidence of the defendants' participation in the DTO is limited to the events immediately surrounding the Cardenas Murder, which is not true and which would undermine the Government's ability to fairly prove an essential element of the charged crime.

### 2. Alternatively, the Evidence is Admissible under Rule 404(b)

Even if the Court finds that any of the acts described above are not direct proof of the charged narcotics conspiracy—which they clearly are—the Court should also find that the acts are admissible under Federal Rule of Evidence 404(b). For example, the acts of violence described above involving Skinner and Brooks all involve other members of the DTO and demonstrate the relationships among the defendants and other members of the DTO, including several former members who will be witnesses at trial. *See United States v. Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993) (explaining that prior acts can "explain how the illegal relationship

12

between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); *Gadsen*, 300 F. App'x at 110 (explaining that "past violent acts" between coconspirators "helps to explain the mutual trust" that existed between coconspirators). They also dispel any notion that the shooting of Efren Cardenas was anything other than a premeditated murder committed by members of the conspiracy whose roles in the enterprise included crimes of this sort. This is highly probative here given that Brooks previously told law enforcement that he was merely a bystander at the scene of the Cardenas Murder and had nothing to do with the shooting. Because eyewitnesses to the murder will testify about Skinner's presence at the scene as well, it is possible that Skinner will also argue that he was an innocent bystander and was not involved in the Cardenas Murder. Evidence of the defendants' participation in the DTO will be strong evidence of intent, planning, preparation, and absence of mistake. Skinner, Brooks, and Merced were not just in the wrong place at the wrong time—they intentionally participated in the murder.

Under Rule 404(b), the acts of violence, gun possession, and drug possession also demonstrate the defendants' access to guns and drugs. *See United States v. Rodriguez*, 761 F. App'x 53, 59 (2d Cir. 2019) *cert. granted, judgment vacated on other grounds by Minaya v. United States*, 140 S. Ct. 463 (2019) (acknowledging that access to guns is a proper purpose for Rule 404(b) evidence (citing *United States v. Zappola*, 677 F.2d 264, 270 (2d Cir. 1982))); *United States v. Guerrero*, 2010 WL 1506548, at *6 (S.D.N.Y. Apr. 14, 2010) (same). In some of the arrests described above, the defendants also lied to law enforcement. Skinner, for example, claimed that his name was "William Johnson" when he was arrested (October 2021 Enterprise Letter ¶ 7), and Merced claimed that he had brought a large quantity of cash to Washington, D.C. to purchase a car (*See* October 2021 Enterprise Letter ¶ 8). These lies to law

13

enforcement demonstrate the defendants' consciousness of guilt and a desire to evade law enforcement detection for their ongoing involvement in a narcotics organization. *See United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993) (holding that "the use of false identification is relevant to show consciousness of guilt" (quoting *United States v. Morales*, 577 F.2d 769, 772 (2d Cir. 1978)); *see also United States v. Rubirosa*, 100 F.3d 943, *3 (2d Cir. 1996) (summary order) (citing *United States v. Acevedo*, 28 F.3d 686, 688 (7th Cir. 1994)) ("[P]ossession of false identification by a drug trafficking defendant . . . can help prove an element of the offense charged, namely that the defendant possessed a culpable state of mind.").

All of the evidence described above is highly probative of Merced, Skinner, and Brooks's membership in a large-scale drug trafficking operation that distributed wholesale quantities of crack cocaine and powder cocaine, which also provides a clear motive for why they participated in the plot to rob and murder Cardenas—to get a large quantity of drugs that they and their co-conspirators could sell in Washington, D.C. for tens-of-thousands of dollars. *See Gonzalez*, 922 F.2d at 1056 (proof that defendant was a major drug dealer provided motive for murdering a confidential informant). In sum, when determining whether the defendants were members of a narcotics enterprise—as the Government must prove as an element of the murder charge in this case—the jury should be allowed to hear evidence of acts of violence, gun possession, and drug trafficking by the defendants in furtherance of the charged narcotics conspiracy.

Finally, many of the incidents described above are impeachment material relating to the Government's own witnesses, including the shootings and murders in paragraphs 1, 5, and 6 of the October 2021 Enterprise Letter, as well as the gun robbery in paragraph 2 of the October 2021 Enterprise Letter, and other acts of violence and drug trafficking having no relation to the defendants in this case as in paragraph 12 of the October 2021 Enterprise Letter. It is well-

established that the Government is entitled to "avoid the appearance that it was concealing impeachment evidence from the jury" by eliciting the testimony during direct examination. *See United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991); *see also United States v. Hamilton*, 3 F. App'x 7, 11 (2d Cir. 2001) (same); *United States v. Escalera*, 536 F. App'x 27, 33 (2d Cir. 2013) (same); *United States v. Brady*, 26 F.3d 282, 289 (2d Cir. 1994) (same). This is yet another reason the jury should be entitled to consider the evidence described in the October 2021 Enterprise Letter, which describes acts of violence, drug trafficking, and gun possession committed by the defendants and other members of the DTO, including the Government's own witnesses.

### 3. The Evidence is Admissible under Rule 403

The defendants suggest that the evidence described in the October 2021 Enterprise Letter should alternatively be precluded under Rule 403. But this argument also completely misses the mark. As described above, the evidence of the defendants' participation in overt acts in furtherance of the charged narcotics conspiracy is highly probative of the existence of the conspiracy itself and the membership of each defendant in the conspiracy. The incidents described in the October 2021 Enterprise Letter will be important corroboration for the testimony of cooperating witnesses who will say that the defendants were members of the DTO and participated in the DTO's operations by selling drugs, carrying guns, and committing acts of violence with other members of the group. Perhaps most to the point, none of these overt acts in furtherance of the conspiracy are "more sensational" nor "more disturbing" than the charged crimes in this case, which involves the brutal murder of a 30-year-old man who was gunned down, shot over 20 times, on a public street. *Roldan-Zapata*, 916 F.2d at 804. As a result, there is no risk here that the probative value of this evidence—which is extremely great and goes

15

directly to an element of the charged crime—will be "substantially outweighed" by the dangers of unfair prejudice under Rule 403. Indeed, there is little risk here of "unfair" prejudice given that all of the evidence described above is direct proof of the charged crime. *See Costantino*, 203 F.3d at 174 (explaining that virtually all evidence is prejudicial to one party or the other and Rule 403 is only directed towards prejudice that is "unfair").

## II.     EVIDENCE AND TESTIMONY ABOUT THE DEFENDANTS' CONTINUING PARTICIPATION IN DRUG TRAFFICKING IS ADMISSIBLE

The defendants also argue that evidence of their continuing involvement in drug trafficking with some of the Government's witnesses at trial in the 2010s should be precluded under Rule 404(b). But these incidents are also highly probative of a continuing relationship of trust between the Government's witnesses and the defendants that has endured through the passage of time. The October 2021 Enterprise Letter and a supplemental letter dated November 18, 2021 (the "November 18, 2021 Enterprise Letter") describe the following incidents:

- In or around 2016, Defendants Luis Merced and Dorian Brooks sold quantities of powder cocaine and crack cocaine to a former member of the DTO, who will be testifying at trial ("Witness-1").

- In or around 2016, Defendants Luis Merced and William Skinner discussed the sale of powder cocaine and heroin with a former member of the DTO, who will be testifying at trial ("Witness-2").

- In or around 2011, Defendant Dorian Brooks received a pound of marijuana from a former member of the DTO, who will be testifying at trial ("Witness-3").

Each of these incidents are admissible to show the continuing relationship of trust between the witnesses and the defendants. The defendants suggest that these incidents are categorically irrelevant for purposes of Rule 404(b). But that argument has been flatly rejected by the Second Circuit. *See United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (noting that "[s]ubsequent acts are frequently probative"); *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007)

16

(refusing to "erect a *per se* bar to evidence of 'other acts' occurring after the charged offense"); *United States v. Cacace*, 2013 WL 12121327, at *1 (E.D.N.Y. Oct. 9, 2013) (admitting evidence of subsequent uncharged crimes that are "probative of defendant's relationships" with other participants in the murder).

Given that the credibility of the Government's witnesses will be hotly contested at trial, the testimony by each witness that they remained in a relationship of trust with the defendants decades after the charged crimes is convincing evidence that they are telling the truth about their relationships with the defendants. In turn, these relationships of trust explain, among other things, why the defendants committed crimes with—and made admissions to—the witnesses during the late 1980s and early 1990s. *See United States v. Morrison*, 2007 WL 1100447, at *4 (E.D.N.Y. Apr. 5, 2007) ("It is one thing to ask an associate or friend to aid in a lawful activity, and yet another to request his assistance in a criminal endeavor. And given the heightened risk typically associated with the latter, the concomitant degree of trust is usually greater."); *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992) (allowing evidence of previous drug transactions to show "a relationship of trust between the parties and that they knew about transactions of this type"). Additionally, given that none of these crimes are even remotely as sensational or disturbing as the charged Cardenas Murder, there is little risk that the defendants will be unfairly prejudiced by this evidence under Rule 403. The jury should be entitled to evaluate the credibility of the Government's witnesses with the benefit of full information about the extent of the relationships between the defendants and the Government's witnesses—relationships of trust built on committing crimes together over the decades.

## **CONCLUSION**

For the foregoing reasons, the defendants' motions *in limine* should be denied.

Dated: November 30, 2021
 New York, New York

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney for the
                                          Southern District of New York

By:         /s/
                                          Andrew K. Chan
                                          Adam S. Hobson
                                          Frank J. Balsamello
                                          Assistant United States Attorneys
                                          (212) 637-1072 / 2484 / 2325

18