UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

          – against –

LUIS MERCED,
WILLIAM SKINNER, and
DORIAN BROOKS,

                              Defendants.

**OPINION & ORDER**

19 Cr. 0832 (ER)

Ramos, D.J.:

          Defendants Luis Merced, William Skinner, and Dorian Brooks are charged with a murder

in aid of drug trafficking that took place in February 1989, in violation of Title 21, United States

Code, Sections 848(e) and 2.  In advance of trial, defendants move to dismiss the indictment,

arguing the 30-year pre-indictment delay violates the Due Process clause of the Fifth

Amendment to the United States Constitution.  In addition, Skinner moves to suppress post-

arrest statements, and Merced moves to suppress evidence.[1]  Merced and Skinner also move for

a severance.  For the reasons discussed, defendants' motions are DENIED.

### I.      BACKGROUND

          The government alleges that defendants participated in a drug trafficking organization

("DTO") that distributed large quantities of crack and powder cocaine in the New York City and

Washington D.C. metropolitan areas in the late 1980s and early 1990s, and that members of the

---

[1] Merced filed two motions to suppress:  first, Merced moved to suppress post-arrest statements made in November 2019, and second, Merced moved to suppress evidence and statements from a seizure in March 1989.  Doc. 53; Doc. 60.  In its opposition to the defendants' pre-trial motions, the government made clear it "no longer intends to introduce [Merced's] post-arrest statements at trial."  Doc. 54 at 2.  As a result, Merced's first motion to suppress is denied as moot.

DTO carried guns and committed numerous acts of violence in furtherance of the DTO's operations.  Doc. 54 at 3.  In particular, the government alleges that on February 10, 1989, defendants and other members of the DTO "hatched a plan to rob and murder Efren Cardenas, who was one of the DTO's suppliers of powder cocaine . . . ." (the "Cardenas Murder") *Id.* According to the government, Cardenas was shot over 20 times on a public street in the Bedford-Stuyvesant neighborhood in Brooklyn, while numerous bystanders watched.  *Id.*  The government alleges that, following the murder, the defendants split the proceeds of the robbery—alleged to be a package or briefcase containing large quantities of cocaine—with co-conspirators and fled to Washington D.C.  *Id.*; Doc. 50-2; Doc. 50-3.

a.   **NYPD and Brooklyn DA's Office Investigation**

Officers and detectives from the New York City Police Department's ("NYPD") 79th Precinct responded to the scene and were in charge of investigating the shooting.  Doc. 54 at 3. At the scene, NYPD officers collected shell casings, took photographs, and interviewed witnesses.  *Id.* at 4.  According to police reports from February 10 and 11, 1989, several of these witnesses gave statements, and were able to provide physical descriptions of the shooters.  *See* Doc. 50-1.  One of these witnesses picked William Skinner and Kevin Flowers[2] out of photo-arrays at the 79th Precinct station house, and another witness identified Skinner from a photo-book as one of the shooters.  *Id.*

According to a police report from February 15, 1989, several witnesses informed police that Merced and another man shot and killed Cardenas, who was near 280 Herkimer Street to conduct a drug transaction.  Doc. 50-2.  The witnesses further reported that Merced and the other

---

[2] Kevin Flowers is alleged to be a member of the DTO.  *See* Doc. 54 at 4; Doc. 50 at 6; Doc. 50-10.

man took drugs from Cardenas and that Merced fled to Washington, D.C.  *Id.*  On February 18, 1989, an anonymous caller provided the police with an account of the shooting, naming as the shooters "Kool-Aid, Will Skinner, and Indian Jim."[3]  Doc. 50-3.  The caller then claimed that "Luis Merced . . . set up the hit," having paged Cardenas to come to 280 Herkimer Street.  *Id.*  According to the caller, when Cardenas got out of the car and began to walk toward 280 Herkimer Street, "Indian Jim . . . started to blast . . ." and "Kool-Aid . . . started to fire."  *Id.*  "Will [Skinner] . . . was shooting too," and "[Cardenas] fell to the ground."  *Id.*  The caller then alleged they "all ran."  *Id.*

On March 3, 1989, officers interviewed Brooks.  *See* Doc. 50-4; Doc. 54 at 4.  According to a police report of the interview, Brooks claimed that (1) he knew "Efram, the guy that got killed;" (2) he was at Merced's apartment at 280 Herkimer street prior to the murder; (3) as he was walking out of the building on the night of the murder, he saw Skinner and Flowers in front of the building; (4) he saw Flowers pull out a firearm and shoot; (5) he heard another gun go off and he fled the scene; and (6) following the murder, Flowers and Skinner were going through the neighborhood looking for him.  Doc. 50-4.  Brooks also was interviewed by the Kings County District Attorney's Office (the "Brooklyn DA's Office") on March 6, 1989.  Doc. 50-5.

### b.  Merced's Seizure and Arrest

On March 9, 1989, Merced was arrested by Drug Enforcement Administration ("DEA") agents in Washington, D.C.  *See* Doc. 50-6; Doc. 60 at 5.  According to the report of the investigation, DEA agents assigned to the Washington National Airport observed Merced purchase airline tickets at the Pan American ticket counter.  Doc. 50-6 at 1-2.  Then, the report

---

[3] "Kool-Aid" is a nickname for Brooks.  Doc. 50 at 5, 8.  "Indian Jim" is a nickname for Harold Sattan, alleged to be a member of the DTO.  *Id.* at 5 n.3; Doc. 50-10.

alleges, Merced met with another man, who later provided the name "Shawn White" to law enforcement. *Id.* at 2. DEA agents observed that Merced and White were wearing very large winter coats while walking through the indoor airport terminal. *Id.* In addition, neither Merced nor White had any bags or luggage. *Id.* DEA agents approached Merced and White in the waiting area for Pan American airlines, identified themselves as law enforcement, and asked to speak to them; Merced agreed. *Id.* The agents also asked Merced and White for their tickets and identification. *Id.* at 2-3. White did not provide identification, but Merced did. *Id.* Merced told the agents he had been visiting Washington D.C. for about a week, but "only shrugged his shoulders upward" when asked why he did not have any luggage. *Id.* at 3.

The agents asked Merced and White to consent to a search of their persons; Merced said "No!". *Id.* The agents then asked Merced and White if they would consent to a narcotic detector dog sniffing their persons. *Id.* Merced replied "Sure, C'mon," and began to walk with White towards the concourse. *Id.* As they walked, one of the agents advised Merced that he would contract the dog handler; Merced stopped and told the agent that he needed to get on the plane immediately. *Id.* In response, the agent told him he would be able to save time by consenting to a search of his person. *Id.* At this point, White agreed to be searched, which led to negative results. *Id.* White then told Merced "go ahead and let him search you so we can get on the plane." *Id.* Merced held his arms up and away from his body and said, "Okay." *Id.* The agents searched Merced's jacket and found a large sum of money in each of his front pockets. *Id.* The agents then told Merced he was being detained in order to be questioned about the money. *Id.*

The agents escorted Merced to the airport police station, while White was allowed to continue towards the departure gate. *Id.* Once at the airport police station, the agents patted

down Merced and felt a large lump in an inside coat pocket. When prompted, Merced told them this was "more money." *Id.* at 4. The agents also found money inside the waistband of Merced's pants, wrapped around his stomach and hidden underneath a sweatshirt and winter coat. *Id.* The agents advised Merced that he was not under arrest, but told him they wanted to ask him questions about the money; he agreed. *Id.*

The agents also ran a criminal history of Merced and identified that an arrest warrant for him had been issued on July 16, 1987 by the Kings County Supreme Court after he failed to appear in court relating to a May 27, 1987 arrest for the sale of drugs. *Id.* at 5. Merced admitted he had been arrested previously on narcotics charges. *Id.* The agents then placed Merced under arrest based on the outstanding warrant. *Id.* In total, the agents seized approximately $23,500 in currency from Merced. *Id.* at 5-6. The agents then contacted law enforcement officers in New York, who responded that the warrant was still outstanding, but that the District Attorney's office had elected not to seek extradition from Washington D.C. to New York; as a result, Merced was released from custody on March 15, 1989. *Id.* at 6-7.

### c.  Skinner's Arrest and Prosecution

On May 23, 1989, NYPD officers met with prosecutors at the Brooklyn DA's Office, who authorized the NYPD to arrest Skinner, Brooks, and Flowers in relation to the Cardenas Murder. Doc. 54 at 4. Skinner was arrested on July 12, 1989. *Id.* On July 2, 1989, a grand jury sitting in Kings County returned an indictment charging Skinner with murder in the second degree, two counts of criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree. *Id.* Skinner proceeded to trial on October 10, 1990, where one eyewitness, Takeisha Williams, testified about seeing Skinner and Brooks firing shots at Cardenas on the night of the murder. *Id.* The jury acquitted Skinner of the murder

and gun possession charges but convicted him of aiding and abetting Brooks' possession of a

gun.  *Id.*  On December 6, 1990, Skinner was sentenced to 4-12 years imprisonment.  *Id.*  On

February 8, 1993, the New York Supreme Court's Appellate Division vacated Skinner's

conviction and dismissed the indictment after finding insufficient evidence that Skinner had

aided Brooks' possession of a gun.  *Id.* at 5; *see People v. Skinner*, 190 A.D.2d 761, 762 (N.Y.

App. Div. 1993).

According to the government, "no other law enforcement agencies aside from the NYPD

and the Brooklyn DA's Office actively investigated the Cardenas Murder between 1989 and

2017."  Doc. 54 at 5.  However, the government acknowledges Brooks and Merced were

investigated and charged with various crimes in the Washington D.C. area.[4]  *Id.*  The

government is also aware that law enforcement agencies in Washington D.C. occasionally

conferred regarding investigations of the DTO with the NYPD and Brooklyn DA's Office.  *Id.*

Still, the government alleges, the NYPD records for the investigation of the Cardenas

Murder and the Brooklyn DA's Office records for the prosecution of Skinner do not indicate that

any other law enforcement agencies opened an investigation into or asked for information about

the Cardenas Murder.  *Id.* at 6.  And, according to the government, DEA databases indicate that

it did not open an investigation into the Cardenas Murder, or otherwise investigate Merced,

---

[4] According to the government, Brooks and other members of the DTO were charged in the District of Columbia
Superior Court in April 1992 with participating in a murder in Washington D.C. on or about February 6, 1989.
Brooks pleaded guilty to murder in the second degree, and was sentenced to 12-36 years' imprisonment, to be
served consecutively to a separate sentence of 18 years' to life imprisonment for a July 1989 murder imposed in
Kings County Supreme Court in January 1991.  *See United States v. Brooks,* Case No. F8955-92 (Cushenberry, J.)
(D.C. Super. Ct. 1992); *People v. Brooks*, Case No. 10150-89 (N.Y. Sup. Ct. 1989).  In addition, Merced was
arrested in November 1991 by the Prince George's County Police Department in Maryland and was convicted after
trial in May 1992 of murder in the second degree, among other offenses, in the Circuit Court for Prince George's
County in Maryland.  Merced was sentenced to 25 years' imprisonment.  *See State of Maryland v. Merced*, Case no.
91-2320.

Brooks, or Skinner for their participation in the Cardenas Murder. *Id.* Instead, the government

alleges, "the Cardenas Murder remained a cold case until 2017." *Id.*

### d. Cold Case Squad Investigation

According to the government, in December 2017, a cooperating witness who had been

arrested by the DEA in New York began meeting with prosecutors and investigators in the

Southern District of New York ("SDNY"), and agents from the NYPD Cold Case Squad. *Id.* At

that time, the government alleges, SDNY and the NYPD Cold Case Squad opened an

investigation into the Cardenas Murder and obtained records from the NYPD and from the

Brooklyn DA's Office relating to the murder and the Skinner prosecution. *Id.* According to the

government, investigators located and interviewed witnesses over the next two years, and, on

November 19, 2019, thirty years after the Cardenas Murder, a grand jury sitting in the Southern

District of New York returned an indictment charging the defendants with the crime. *Id.* at 6-7.

### e. Skinner's Post-Arrest Statements

Skinner was arrested on November 20, 2019, and was transported to the NYPD Cold

Case Squad Office in Brooklyn, New York for processing. *Id.* at 7. According to Skinner, he

"repeatedly asked why he was being arrested and was met with silence." Doc. 51-5 at 3.

"[A]fter a time," Skinner alleges, law enforcement officers informed him that he had been

indicted with the Cardenas Murder in the Southern District of New York and, according to the

government, also advised him that they would not be asking him any questions about the case.

Doc. 51-5 at 3; Doc. 54 at 7. The government alleges that Skinner replied: "Wow, okay." The

government further alleges that while Skinner was awaiting his interview with Pretrial Services,

he made additional spontaneous statements to law enforcement, including: (1) "The guy

responsible for this died—Sequan."; (2) "I beat this.  I can beat this again."; (3) "Me and Lou are good."; and (4) "Well, I think I want to talk to you."  Doc. 54 at 7.

According to Skinner, he was "not provided with Miranda warnings," "was not at first told what [he] was being arrested for, and had no idea of the charge against [him]."  Doc. 51-2 at 1.  Skinner alleges that when "they finally let [him] know the 'feds' were charging [him] with a very old murder, [he] was shocked and made some statements about [his] situation."  *Id.*  Skinner maintains these statements were his "response to learning of [his] situation from the police."  *Id.*

## II.     MOTION TO DISMISS

### a.  Applicable Law

The Supreme Court has recognized that excessive pre-indictment delay may in some cases deny a criminal defendant his Fifth Amendment right to due process of law.  *United States v. Marion*, 404 U.S. 307, 324 (1971).  To prevail on a claim of unconstitutional pre-indictment delay, a defendant bears the "'heavy burden' of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose."  *United States v. Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999) (emphasis in original) (citing *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990)); *Marion*, 404 U.S. at 324 (to establish that pre-indictment delay constitutes a violation of due process, defendant must show that the "delay . . . caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain a tactical advantage over the accused").  The Second Circuit has observed that "while the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar."  *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 790-91 (2d Cir. 1999).

The Second Circuit has defined actual prejudice as the "sort of deprivation that impairs a defendant's right to a fair trial." *Cornielle*, 171 F.3d at 752 (citing *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979)). This may be established, for example, by the loss of documentary evidence or the unavailability of a key witness. *Id.* But to prevail, it is not enough to point to the loss of evidence or the unavailability of witnesses. At a minimum, a defendant must show *how* the loss of evidence or unavailability of witnesses is prejudicial, relying on proof that is "definite and not speculative." *United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (internal quotations omitted); *see also United States v. Wallace*, No. 97 Cr. 975 (RWS), 1998 WL 401534, at *12 (S.D.N.Y. July 17, 1998) (characterizing the actual prejudice standard as "fairly stringent"). "Faded memories or unavailable witnesses are inherent in any delay, even if justifiable. To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." *United States v. Delacruz*, 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013) (internal citations omitted).

As to intentional improper purpose, prosecutorial negligence, such as "[b]ureaucratic oversight . . . or lack of proper case administration, does not rise to the level of conduct which justifies dismissing a criminal indictment." *United States v. Harrison*, 764 F.Supp. 29, 33 (S.D.N.Y. 1991); *see also Salcedo v. Phillips*, No. 04 Civ. 7964 (PAC) (GWG), 2007 WL 3907208, at *4 (S.D.N.Y. Oct. 22, 2007) (lack of police diligence, without more, does not constitute a due process violation). And, as the Supreme Court has made clear, prosecutors "are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *United States v. Lovasco*, 431 U.S. 783, 791 (1977).

**b. Discussion**

9

Here, the defendants move to dismiss the indictment on the grounds that the 30-year pre-indictment delay violates their rights under the Due Process Clause of the Fifth Amendment. Doc. 50 at 1.  Defendants allege the government has known about the Cardenas Murder since 1989, but waited until 2019 to indict them.  *Id.* at 2.  According to defendants, this "unprecedented three-decade-long delay in initiating charges is not the result of any investigative need, but was prompted by tactic and undertaken with a reckless disregard for the [defendants'] ability to defend [themselves]."  *Id.*  As a result, defendants argue, "critical evidence has vanished, memories have faded and witnesses and records are no longer available."  *Id.*

But this is not enough to demonstrate actual prejudice.  Defendants argue they have "irretrievably lost" testimony of eyewitnesses to the murder and of other witnesses who might have knowledge of the relationships, if any, between Brooks, Skinner, and Merced, as well as telephone and beeper records which "could help establish the contacts or lack thereof between the various parties . . . ."  *Id.* at 13-15.  Specifically, Brooks alleges he has been unable to locate or otherwise contact several witnesses he believes are unavailable as a result of the delay: Takeisha Williams, an eyewitness who testified at Skinner's state court trial and whose counsel has denied Brooks' requests to speak with her, and a group of eyewitnesses, Tawana Williams, Keisha Stubbs, Michael Mitchell, Fred LNU, and Cornell LNU.  *Id.*  Brooks also argues the delay has denied him the opportunity to interview and possibly call Elizabeth Merced, who has since died.  *Id.*  And Skinner generally alleges that "[w]itnesses have died, disappeared, suffered loss of accurate recollection, retired, or refused to be interviewed," though he provides no specific details.  Doc. 51-5 at 4.

But none of the defendants has shown *how* the unavailability of these witnesses or the loss of records has prejudiced them.  *See Birney*, 686 F.2d at 105-06 (to satisfy his burden of

proof, a defendant "must demonstrate *how* (the loss of evidence) is prejudicial," and the proof

offered "must be definite and not speculative"). In other words, defendants do not put forth any

evidence about what these witnesses would say if called to testify at trial, what the telephone and

beeper records would reveal, or how this testimony or evidence would aid their defense. Indeed,

as to Elizabeth Merced, Brooks notes he "does not know what evidence Ms. Merced could

provide to corroborate Mr. Brooks' statement to the police that he was in her apartment . . .

before the shooting . . . ." Doc. 50 at 15.

     Defendants' conjectures about what, if anything, these witnesses might have said or the

records might have shown are merely speculative, and do not satisfy the "stringent" standard for

actual prejudice. *Wallace*, No. 97 Cr. 975, 1998 WL 401534, at *12; *see also United States v.

Badoolah*, No. 12 Cr. 774 (KAM), 2014 WL 4793787, at *3-4 (E.D.N.Y. 2014) (declining to

find actual prejudice where defendants argued that delay caused them to suffer "the 'missed

opportunity' to explore whether a witness could offer testimony favorable to [their] defense");

*United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005) (broad statements that

unavailable witnesses "would have exculpated [defendant] entirely on Counts One and Two" and

"[c]ounsel's unsworn assertions as to vague generalities" that witnesses, "if alive, would give

testimony helpful to [defendant] do not show that [defendant]'s ability to present a defense has

been substantially and actually prejudiced"); *United States v. Gotti*, No. S4 02 Cr. 743

(RCC), 2004 WL 32858, at *4 (S.D.N.Y. Jan. 6, 2004) (defendants' suggestion that missing

witness "might have testified that they were not involved in the . . . murder" was "utterly devoid

of a factual or legal basis"); *United States v. Gonzalez*, No. 00 Cr. 447 (DLC), 2000 WL

1721171, at *1-2 (relocation of some witnesses "who may have witnessed" the crime at issue

was insufficient basis for due process challenge); *United States v. Rubin*, 609 F.2d 51, 66 (2d

Cir. 1979) ("faded recollections and missing peripheral witnesses are not enough"); *United States v. Mallah*, 503 F.2d 971, 989 (2d Cir. 1974) (generalized inability to find alibi witnesses was "too speculative").

As such, defendants' attempt to demonstrate actual prejudice as a result of the pre-indictment delay is unavailing and, accordingly, dismissal on due process grounds must be denied. Because of this, the Court need not address the reason for the delay. *United States v. Wey*, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017) ("[b]ecause . . . the Court concludes that Wey has not articulated actual and substantial prejudice, it need not address the Government's state of mind or purpose in delaying the filing of the charges at issue); *United States v. Pierre-Louis*, 16 Cr. 41 (CM), 2018 WL 4043140, at *5 (S.D.N.Y. August 9, 2018) ("[b]ecause Defendant failed to show prejudice, the Court need not even address the second prong").

In any event, even if defendants could demonstrate actual prejudice as a result of the delay, they fail to proffer any evidence that the pre-indictment delay resulted from some improper purpose. Defendants put forth no evidence that the government engaged in any deliberate actions to delay the indictment in this case for its own benefit, and do not point to any tactical advantage the government might have gained from the delay; indeed, Brooks concedes that this is "not . . . a case where the Government made a conscious decision to hold off on prosecution . . . in order to maximize the chances that the witnesses who could give favorable testimony . . . might disappear." Doc. 50 at 18. Instead, Brooks alleges that the government, in "unfairly delay[ing] the timing of its charging decisions," displayed a "reckless disregard" for his rights. *Id.* at 19.

But, as the government argues, the defendants have "provided no reason why the [federal government] would have been interested in charging Skinner, Brooks, or Merced with the

12

Cardenas Murder in the early 1990s."  Doc. 54 at 18.  At that time, Skinner, the one defendant arrested and charged in state court, was acquitted of the murder at trial and had his weapons possession conviction overturned on appeal for insufficient evidence.  *Id.*  At Skinner's trial, the state presented the testimony of a single eyewitness, and, as the government argues, this is "hardly the type of overwhelming evidence that would have caused the DOJ to bring separate federal charges relating to the Cardenas Murder."  *Id.* at 19.  In addition, in the early 1990s, both Brooks and Merced were arrested and charged with other murders; as the government explains, there "was no compelling law enforcement reason for the DOJ to charge or otherwise investigate the Cardenas Murder at that time."  *Id.*  Instead, the government alleges, it had no reason to investigate—and, indeed, did not investigate—the Cardenas Murder until December 2017, when prosecutors met with a cooperating witness who had been arrested by the DEA and was willing to provide information about the Cardenas Murder.  *Id.* at 19-20.  Prosecutors then retrieved records from the NYPD and the Brooklyn DA's office, interviewed additional witnesses, and, in November 2019, obtained an indictment.  The government argues "this case is no different from the dozens of cold-case homicides that have been charged around the country when new evidence comes to light . . . ."  *Id.* at 20.

Without further proof from the defendants as to deliberate and unjustifiable government conduct, defendants have failed to allege the "improper purpose" element of their due process claim.  Because defendants cannot satisfy the "heavy burden" of proving both actual prejudice and an improper purpose, their motion to dismiss is denied.

### III.   MOTION TO SEVER

#### a.  Applicable Law

Rule 8(b) of the Federal Rules of Criminal Procedure provides that joinder of two or more defendants may be appropriate where the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim P. 8(b). The Second Circuit has interpreted this language to mean that joinder is proper where two or more persons' criminal acts are "unified by some substantial identity of facts and participants, or arise out of a common plan or scheme." *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (citations omitted); *see also United States v. Joyner*, 201 F.3d 61, 74-5 (2d Cir. 2000) (a "series of acts or transactions" under Rule 8(b) exists where "there is a logical nexus between the transactions"); *United States v. Harris*, No. 00 Cr. 105 (RP), 2000 WL 1229263, at *1 (S.D.N.Y. Aug. 29, 2000) ("non-frivolous" allegation that defendants were involved in single scheme supports joinder under Rule 8(b)).

Rule 14 of the Federal Rules of Criminal Procedure allows for severance where joinder of defendants "appears to prejudice a defendant . . . ." Fed. R. Crim. P. 14(a). The decision whether to grant a severance is "committed to the sound discretion of the trial judge." *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). "There is a preference in the federal system for defendants who are jointly indicted to be jointly tried." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Turoff*, 853 F.2d 1037, 1039 (2d Cir. 1988) ("joint trials serve the public interest in economy, convenience, and the prompt trial of the accused"); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (the "principles that guide the district court's consideration of a motion for severance usually counsel denial"); United *States v. Lauersen,* No. 98 Cr. 1134 (WHP), 2000 WL 1677931, at *6 (S.D.N.Y. Nov. 8, 2000); *United States v. Rahman,* 854 F. Supp. 254, 262 (S.D.N.Y.1994), *aff'd* 189 F.3d 88 (2d Cir. 1999). "This preference is particularly strong where . . . the defendants are alleged to have participated in a

common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (*per curiam*).

A defendant arguing that severance is appropriate, therefore, must demonstrate more than the danger of some prejudice, or a better chance at acquittal in a separate trial. *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990). Severance requires the defendant to demonstrate that he would be prejudiced so severely by the joinder that he would be denied a constitutionally fair trial, resulting in a miscarriage of justice. *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988); *Zafiro*, 506 U.S. at 539 (severance of defendants is warranted only where there "is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence" of one of the defendants). "[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)). Even where there is a prejudice as a result of "disparity of proof . . . joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993); *Carson*, 702 F.2d at 366-7 (different levels of culpability among defendants insufficient to support severance).

Even assuming that a particular defendant can demonstrate some prejudice resulting from joinder, "'[t]he defendant seeking a severance must shoulder the difficult burden of showing that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials.'" *United States v. Lanza,* 790 F.2d 1015,

1019 (2d Cir.) (quoting *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984)).  As the

Second Circuit has noted:

> The deference given by an appellate court to a trial court's severance decision reflects the
> policy favoring joinder of trials, especially when the underlying crime involves a
> common plan or scheme and defendants have been jointly indicted.  Acknowledged in
> this policy is the inevitable tolerance of some slight prejudice to codefendants, which is
> deemed outweighed by the judicial economies resulting from the avoidance of
> duplicative trials.  Further, the risk of inconsistent verdicts resulting from separate trials,
> and the favorable position that later tried defendants obtain from familiarity with the
> prosecution's strategy is obviated through multidefendant trials.

*United States v. Cardascia,* 951 F.2d 474, 482–83 (2d Cir.1991).

Where "spillover evidence" is alleged as the grounds for Rule 14 severance, the

defendant's burden is particularly heavy.  *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.

1988), *cert. denied*, 490 U.S. 1004 ("A defendant raising a claim of prejudicial spillover bears an

extremely heavy burden"); *United States v. Gambino*, 809 F. Supp. 1061, 1074 (S.D.N.Y. 1992)

("claims of 'prejudicial spillover' rarely succeed").

Rather than grant a motion for severance, a district court may cure risk of prejudice

through "less drastic measures, such as limiting instructions."  *Zafiro*, 506 U.S. at 539*; see

also Rittweger*, 524 F.3d at 179 (affirming a denial of a severance motion where the district court

gave limiting instructions throughout the trial explaining when evidence could not be considered

against a particular defendant, and the jury charge carefully explained that the jurors must

consider the case against each defendant separately); *United States v. Feyrer*, 333 F.3d 110, 115

(2d Cir. 2003) (affirming the district court's ruling that, to the extent that any prejudice arose

from a joint trial, it could be cured by the careful presentation of evidence by competent counsel

and by a specific charge reminding the jury that one defendant was accused of one scheme and

the other of a different scheme, specifying that separate consideration was to be given to each

count against each defendant); *United States v. Hernandez*, 85 F.3d 1023, 1029-30 (2d Cir. 1996)

16

(rejecting a claim of spillover where the district court instructed the jury that it was required to consider the evidence against each defendant individually for each count).

### b. Discussion

Here, all three defendants were indicted together, and are alleged to have participated in a common scheme, namely a murder in the aid of drug trafficking. *See* Doc. 1. This is more than enough to meet the requirements for joinder under Rule 8. *See* Fed. R. Crim. P. 8(b) (joinder is appropriate where defendants "are alleged to have participated in the same act or transaction . . . constituting an offense or offenses"); *Cervone*, 907 F.2d at 341 (joinder is proper where two or more persons' criminal acts "arise out of a common plan or scheme"); *Zafiro*, 506 U.S. at 537 ("[t]here is a preference in the federal system for defendants who are jointly indicted to be jointly tried"); *Salameh*, 152 F.3d at 115 (preference for joinder of defendants is "particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme").

Both Merced and Skinner have requested that their cases be severed and tried separately. *See* Doc. 51; Doc. 53. Skinner seeks an order severing him from Brooks pursuant to Rule 14 and the Confrontation Clause, Doc. 51 at 1, arguing a joint trial would violate *Bruton v. United States*, 391 U.S. 123 (1968), because Brooks' post-arrest statements to law enforcement implicate Skinner in the Cardenas murder. Doc. 51-5 at 3, 6-7. Specifically, Brooks' statements place Skinner at the scene of the murder at the time of the murder. *See* Doc. 51-4. In its opposition to the defendants' motions, the government makes clear that, if it seeks to admit statements by Brooks to law enforcement at trial, it "will propose a redacted version of Brooks' statements, and the parties can litigate the proposed redactions in motions *in limine* if necessary." Doc. 54 at 31. The government argues these redactions, "together with a limiting instruction to the jury, can satisfy *Bruton*." *Id.* The Court agrees.

17

The Confrontation Clause of the Sixth Amendment affords the accused the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Bruton v. United States*, the Supreme Court held "that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant."  *Richardson v. Marsh,* 481 U.S. 200, 201–02 (1987). In *Richardson,* the Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  48 U.S. at 211.  In *Gray v. Maryland,* the Supreme Court held that there is no *Bruton* violation where the co-defendant's post-arrest statement is redacted so that the complaining defendant's name is replaced by a neutral pronoun.  523 U.S. 185, 192 (1998).

The Second Circuit has expanded on the *Richardson* and *Gray* doctrines, holding that there is no *Bruton* violation "so long as the confession alone is not incriminating to the complaining defendant, even if it along with other evidence at trial implicates that defendant, and so long as the judge gives a proper limiting instruction."  *Aramas v. Donnelly,* No. 99 Civ. 11306 (JSR) (AJP), 2002 WL 31307929, at *12–13 (S.D.N.Y. Oct 15, 2002); *accord United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir.1989) ("[A] redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's *Bruton* rights . . . ."); *United States v. Martinez–Mantilla,* 135 F. Supp. 2d 422, 424–25 (S.D.N.Y. 2001) ("the *Bruton* rule is not violated even where the interlocking of the redacted

statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the co-defendant; thus, the redacted statements must be viewed in isolation from other evidence to determine whether it is incriminating on its face.").

Because Skinner cannot show he would be "prejudiced so severely by the joinder that he would be denied a constitutionally fair trial," *Rosa*, 11 F.3d at 341, and because any risk of prejudice can be cured by redactions and limiting instructions, Skinner's motion to sever his trial from that of Brooks is denied.

Merced seeks an order severing his trial from the trials of Brooks and Skinner, Doc. 52 at 1, arguing a joint trial would result in "prejudicial spillover" from evidence the government would present against Brooks and Skinner.  Doc. 53 at 6-7.  Merced argues there is "substantial evidence against both Brooks and Skinner," including witness testimony presented at Skinner's New York State trial.  *Id.* at 7.  Merced alleges that whether the government can prove the charge beyond a reasonable doubt will boil down to whether the jury finds credible the testimony of the cooperators and civilian witnesses the government intends to call.  *Id.*  Merced further alleges that because the government will show that testimony against Brooks and Skinner will be corroborated by other evidence, the government "will likely argue . . . [that] the jury should *also* believe such witnesses' testimony against Merced."  This, Merced argues, "is the essence of prejudicial spillover . . . ."  *Id.* (emphasis added).

In other words, Merced argues that the evidence against him is weaker than the evidence against Skinner and Brooks, and that while testimony from cooperating witnesses will corroborate the evidence against Skinner and Brooks, such testimony will not corroborate evidence against him.  The government argues that is not the case, explaining that it "anticipates

no meaningful difference in the strength of evidence against the three defendants at trial . . . ." Doc. 54 at 31.  In any event, the government argues, "Merced has certainly not demonstrated or even alleged that this is a case where the 'sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant' that it requires a severance."  *Id.* (citing *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003)).

Where "spillover evidence" is alleged as the grounds for Rule 14 severance, the defendant's burden is "extremely heavy." *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988), *cert. denied*, 490 U.S. 1004; *Gambino*, 809 F. Supp. at 1074 (S.D.N.Y. 1992) ("claims of 'prejudicial spillover' rarely succeed").  Merced's speculations about what evidence the government might or might not present are insufficient to meet this "extremely heavy" burden. In any event, even if Merced could show that the evidence against him is weaker than the evidence against Skinner and Brooks or that he is less culpable than his co-defendants, the Second Circuit has repeatedly held that "'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" *Torres*, 901 F.2d at 230 (citations omitted); *see also United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987) ("[t]hat one [defendant's] role in the conspiracy may have smaller or less central than that of certain other co-conspirators does not mandate a separate trial"); *Carson*, 702 F.2d at 367 ("the fact that evidence may be admissible against one defendant but not another does not necessarily require severance").

Merced also argues that his trial should severed from that of Brooks as it is possible he would call Brooks to testify in his defense.  Doc. 53 at 7.  In particular, Merced argues that because Brooks' statement identifies people who were present at the murder, but does *not* name

him, he might call Brooks to testify that he was not present at the shooting, which he cannot do in a joint trial. *Id.*

The government counters that Merced has offered no evidence that Brooks is actually willing to waive his Fifth Amendment privilege and testify, nor "has Merced provided compelling evidence that Brooks' testimony would be helpful to him . . . ." Doc. 54 at 30-33. Indeed, the government argues, "there is a high likelihood that truthful testimony from Brooks will actually be extremely damaging to Merced's case," as Brooks told law enforcement officers that "he was coming from Merced's apartment at the time of the shooting, which is consistent with the Government's theory that Merced participated in the planning of the Cardenas Murder but was not himself one of the shooters." *Id.*

Again, Merced's general speculations about whether Brooks might testify and whether his testimony would be helpful are insufficient to meet the heavy burden needed to justify severance. Because he has not met the burden for showing a single trial would be prejudicial, and because any risk of prejudicial spillover can be cured with an appropriate instruction from the Court, Merced's motion to sever is denied.

## IV.    SKINNER'S MOTION TO SUPPRESS

### a.  Applicable Law

The Fifth Amendment to the U.S. Constitution requires, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness to be a witness against himself." U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court held that police cannot interrogate a suspect in custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any

questioning if he so desires."  384 U.S. 436, 479 (1966).

These warning requirements apply only to custodial interrogations.  *United States v.*

*Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 444).  Under Second

Circuit precedent, "the term 'interrogation' under *Miranda* refers not only to express

questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect."  *Rosa v. McCray*, 396 F.3d 210, 220-21 (2d Cir. 2005)

(internal quotations omitted).  The test for what constitutes custody is an objective one:  whether

a reasonable person in the defendant's position would have understood himself to be subjected to

the restraints comparable to those associated with formal arrest."  *Newton*, 369 F.3d at 671

(internal citations omitted).  On a motion to suppress statements, the defendant bears the burden

of showing that he was subject to custodial interrogation.  *United States v. Pena*, 961 F.2d 333,

336 (2d Cir. 1992).  A "spontaneous utterance" from a defendant in custody prior to being

*Mirandized* is admissible if it is "given freely and voluntarily without any compelling influence"

and is "not the result of police interrogation."  *United States v. Compton*, 428 F.2d 18, 22 (2d

Cir. 1970).

The Second Circuit has determined that "a court must ordinarily hold [a]n evidentiary

hearing on a motion to suppress . . . if the moving papers are sufficiently definite, specific,

detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to

the validity of the search are in question."  *United States v. Durand*, 767 F.App'x 83, 87 (2d Cir.

2019) (internal citations and quotation marks omitted).  This must be shown "by an affidavit of

someone with personal knowledge of the underlying facts" which establish that "disputed issues

of material fact exist." *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)

(internal citations and quotation marks omitted).  An evidentiary hearing will not be required "if

the defendant's statements are general, conclusory or based on conjecture."  *Id.*  Courts in this

district "have broad discretion when deciding whether or not to hold a suppression hearing."

*United States v. Shamsideem*, No. 03 Cr. 1313 (SCR), 2004 WL 1179305, at *9 (S.D.N.Y. Mar.

31, 2004).

> ### b.  Discussion

In the instant action, Skinner seeks to suppress statements he made to law enforcement

officers following his arrest on November 20, 2019, and requests an evidentiary hearing on the

motion.  It is undisputed that Skinner was in custody when he made these statements and that he

was not provided with *Miranda* warnings.  *See* Doc. 51-5 at 3.  However, the government

contends that Skinner's statements were "spontaneous," and that none of his statements was

made in response to questioning by law enforcement, or the functional equivalent of questioning.

Doc. 54 at 22, 25-6.

According to Skinner, he "repeatedly asked why he was being arrested and was met with

silence."  Doc. 51-5 at 3.  Then, Skinner alleges, "after a time," law enforcement officers

informed him that he had been indicted with the Cardenas Murder.  *Id.*  In response, Skinner

made a series of statements, including:  "Wow, okay"; "The guy responsible for this died—

Sequan."; "I beat this.  I can beat this again."; "Me and Lou are good."; and "Well, I think I want

to talk to you."  Doc. 54 at 7.  Skinner argues that the officers, in informing him of the charge,

were engaged in "a stratagem designed to increase the atmosphere of coercive custody," and that

he was "shocked to [learn] he was being charged with the vintage Cardenas homicide in Federal

court," and felt "impel[ed] . . . to speak once he learned of the accusation."  Doc. 51-5 at 5.  This does not amount to custodial interrogation.

"Evidence that police conduct 'struck a responsive chord' in a detained person is not enough, by itself, to equate the conduct to 'interrogation.'" *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 303 (1980)).  Indeed, "the *Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to charges." *Id.* (noting "courts have generally rejected claims that disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, constitutes 'interrogation' under *Innis*"); *see also United States v. Payne,* 954 F.2d 199, 202 (4th Cir.), *cert. denied,* 503 U.S. 988 (1992); *United States v. Wipf,* 397 F.3d 677, 685 (8th Cir.) (officer's explanation to suspect of charges against him did not amount to interrogation), *cert. denied,* 546 U.S. 835 (2005); *Enoch v. Gramley,* 70 F.3d 1490, 1500 (7th Cir. 1995) ("[b]riefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation"), *cert. denied,* 519 U.S. 829 (1996).

Here, Skinner was at no time questioned nor confronted with evidence.  Instead, he initiated the conversation with arresting officers, asking why he had been arrested, and was given an answer.  This, on its own, does not constitute interrogation or its functional equivalent: Skinner has failed to demonstrate that his statements were made in response to questioning or to tactics that were reasonably likely to elicit an incriminating response from him.  *Rosa*, 396 F.3d at 220-1.  Moreover, nothing proffered by Skinner is "sufficiently definite, specific, detailed, and nonconjectural" to show that his statements were in response to interrogation or its functional

24

equivalent.  Accordingly, an evidentiary hearing on Skinner's motion to suppress is unnecessary, and his motion to suppress is denied.  His post-arrest statements are admissible.

## V.      MERCED'S MOTION TO SUPPRESS

### a.   Applicable Law

The Fourth Amendment to the U.S. Constitution protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.  *Davis v. United States*, 564 U.S. 229, 236 (2011).  If a court concludes that a search or seizure violated the Fourth Amendment, it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure.  *See Mapp v. Ohio*, 267 U.S. 643 (1961).

The exclusionary rule is a "deterrent sanction," *Davis*, 564 U.S. at 231-32, and "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'"  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  Because the exclusionary rule is a "prudential" doctrine, *see Davis*, 564 U.S. at 236, it is "applicable only . . . where its deterrence benefits outweigh its substantial social costs," as "suppression of evidence . . . has always been our last resort, not our first impulse."  *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  Even in the event of an unconstitutional seizure, evidence related to that seizure still may be admissible where "the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance."  *Id.* at 2061.

### b.   Discussion

Here, Merced requests that the Court suppress all evidence seized as a result of the search of his person conducted at Washington National Airport on March 9, 1989, and further moves to suppress all fruits of the seizure, including any alleged statements and any evidence recovered during or following the search and seizure on that date. *See* Doc. 56 at 1. In the alternative, Merced requests a hearing on the issue. *Id.* at 7. Merced alleges the seizure, search, and arrest "violated the Fourth Amendment . . . because officers lacked any particularized probable cause that . . . [he] was involved in any illegal activity." *Id.* at 5. Merced argues "[t]here was nothing suspicious about two young men walking in the concourse other than, apparently, the fact that they were young, Black, and wearing large coats in winter." *Id.* Merced further argues there was no reason to detain him, and that his seizure extended the limits of the type of investigative stop permitted by *Terry v. Ohio*, 392 U.S. 1 (1968), and therefore amounted to a seizure in violation of the Fourth Amendment. *Id.* According to Merced, when agents approached him, "they had no information to tie [him] to any criminal activity," and, Merced argues, his "skin color, age, clothing, or lack of carry-on luggage does not give law enforcement permission to pretextually stop him." *Id.* at 6. In response, the government makes a series of arguments, including that law enforcement officers did not improperly detain Merced and the search was consensual. Doc. 60 at 6, 11. The Court agrees on both counts.

In its Fourth Amendment cases, the Second Circuit has recognized that there are "three levels of interaction between agents of the government and private citizens," each level requiring a different degree of justification. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). First, the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen. *See Brown v. City of Oneonta,* 221 F.3d 329, 340 (2d Cir. 2000). Such an encounter does not constitute a seizure and therefore does not require any

justification nor does it "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick,* 501 U.S. 429, 434 (1991).  Second, the police may briefly detain a person as part of an investigation if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). Third, the police may arrest an individual if they have probable cause to believe that he has committed a felony or a criminal offense in the police's presence.  *See Atwater v. City of Lago Vista,* 532 U.S. 318 (2001).  A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all the circumstances would believe he was not free to walk away or otherwise ignore the police's presence.  *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir. 1992).  "The test is an objective one . . . based on how a reasonable innocent person would view the encounter." *Id.* (citations omitted).

Merced alleges he was illegally stopped and detained by DEA agents. Doc. 56 at 1-2, 5-6. But the government contends the agents did not stop or detain Merced at all during the initial stages of the encounter.  Doc. 60 at 6.  Rather, the government argues, the agents approached Merced in the waiting area, identified themselves as law enforcement, asked questions, and requested to see identification.  *Id.*  Such conduct, without more, does not amount to a seizure implicating the Fourth Amendment's protection, and requires no justification.  *See Glover*, 957 F.2d at 1008.  The Supreme Court has held that "even when officers have no basis for suspecting an individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434.  In other words, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id*; *see also United States v. Medenhall*, 446

U.S. 544, 551-57 (1980) (finding that DEA agents were permitted to approach and question passenger walking through airport concourse); *Glover*, 957 F.2d at 1008 (upholding questioning by DEA agents in a bus terminal).

Merced alleges the encounter became a seizure when, after he refused to consent to a search of his person, the officers "persisted," suggesting that he would be able to "save time" by consenting to a search.  Doc. 63 at 1.  Merced argues that no reasonable person in his position would feel free to leave and that, as a result, the encounter constituted a seizure.  *Id.* at 1-2.  The Second Circuit has enumerated certain factors that might suggest a seizure occurred, namely:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Glover*, 957 F.2d at 1008 (quoting *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)).  Here, there is no evidence in the record that the agents displayed weapons or touched Merced.  And, while Merced notes he was stopped by two DEA agents and two TSA agents, the mere presence of police officers is not enough, by itself, to "transform[] an otherwise consensual encounter into a Fourth Amendment seizure."  *Lee*, 916 F.2d at 819.  Moreover, the agents' suggestion that Merced would "save time" by consenting to a search does not amount to language indicating that compliance was compulsory.

In any event, even if the encounter constituted an investigative stop, rather than a consensual encounter, the DEA agents had reasonable suspicion to support the stop.  A law enforcement officer is permitted to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  *Sokolow*, 490 U.S. at 6 (1989); *Terry*, 392 U.S. at 30.  The test for reasonable suspicion

is a lenient one. "The Fourth Amendment requires 'some minimal level of objective justification'

for making the stop.  That level of suspicion is considerably less than proof of wrongdoing by a

preponderance of the evidence . . . . [Thus] the level of suspicion for a *Terry* stop is obviously

less demanding than that for probable cause." *Sokolow,* 490 U.S. at 7 (citations omitted).  In

determining whether reasonable suspicion existed at the time of the seizure, the Court "must

view the surrounding circumstances (i) 'as a whole, not as discrete and separate facts,' and (ii)

'through the eyes of a reasonable and cautious police officer on the scene guided by his

experience and training.'" *United States v. Barlin,* 686 F.2d 81, 86 (2d Cir.

1982) (quoting *United States v. Delos–Rios,* 642 F.2d 42, 45 (2d Cir.), *cert. denied,* 451 U.S. 941

(1981)).  However, the government still bears the burden of showing that the officer's actions

were based on "something more than an inchoate and unparticularized suspicion or

hunch." *Sokolow*, 490 U.S. at 7 (internal citations and quotation marks omitted).

      Here, the government argues that by the time the agents told Merced he would "save

time" by consenting to a search, the agents had developed a reasonable suspicion supported by a

number of observations, including that Merced and White were wearing "unusually large winter

jackets and carrying no bags, backpacks, or luggage while walking towards the departure gates;"

Merced bought two airline tickets with cash; Merced and White "made a point of keeping

distances from one another as they approached security;" Merced had no explanation for why he

had no luggage during a one-week trip to Washington D.C.; Merced avoided eye contact with

agents; and White had no identification matching the name on his ticket.  Doc. 60 at 10.   The

facts here are similar to those in *Sokolow*, where the Supreme Court held officers had a

reasonable suspicion to stop Sokolow, who paid for two airplane tickets with cash, traveled

under an alias, stayed in Miami for only 48 hours, appeared nervous during his trip, and checked

none of his luggage.  490 U.S. at 3; *see also United States v. Padilla*, 548 F.3d 179 ("[e]ven

conduct that is "as consistent with innocence as with guilt may form the basis for an investigative

stop where there is some indication of possible illicit activity'"); *Terry*, 392 U.S. at 22

(recognizing that a "series of acts, each of them perhaps innocent in itself," can when "taken

together warrant[] further investigation"); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[o]ur

cases have also recognized that nervous, evasive behavior is a pertinent factor in determining

reasonable suspicion").

In his reply, Merced argues the government's observations fall short of the standard

required for reasonable suspicion, and that the "laundry list of facts" proffered does not "lead to

a particularized, objective conclusion that [Merced] was engaged in any wrongdoing," and

instead "shows a race-based pretextual stop."  Doc. 63 at 3.  Merced analogizes to two cases

where the court found unreasonable seizures, one from the Fourth Circuit and one from the Eight

Circuit, *Id.* at 4, but neither of these is controlling here.  Under *Terry*, Merced's winter coat and

lack of luggage, as well as his cash payment and nervous behavior (avoiding eye contact,

keeping distance from White), taken together are enough to support an investigatory stop.

Next, Merced argues that he did not voluntarily consent to a search of his person.  Doc.

56 at 6.  In particular, Merced argues that agents "persisted in their desire to search [him]," even

after he "unequivocally said no," and that this persistence, combined with his fear of missing his

flight, "caused [his] will to be overborne."  *Id.*  "It is well settled that a warrantless search does

not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a

person authorized to grant such consent.'"  *Hernandez*, 85 F.3d at 1028 (quoting *United States v.

Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)).   In evaluating the voluntariness of the consent, courts

consider multiple factors, including "the individual's age, intelligence and educational

background, the length and nature of the questioning and whether the law enforcement officials engaged in coercive behavior." *United States v. Jones,* 154 F. Supp. 2d 617, 621 (S.D.N.Y. 2001) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 (1973)).  Those factors, however, are merely guideposts because in evaluating voluntariness, courts look to the "totality of all the circumstances," *Schneckloth,* 412 U.S. at 227; *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir. 1996); *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993), and generally, no single factor will be sufficient on its face to merit a finding of involuntariness, *see Schneckloth,* 412 U.S. at 226–27.

The inquiry is guided by an "objective standard," and thus the ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search."  *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995) (citations omitted); *see Florida v. Jimeno,* 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

As noted, no single factor is typically sufficient to merit a finding of involuntariness.  And the Second Circuit has specifically rejected—as insufficient to vitiate the voluntariness of consent—the fact that a defendant was in custody or handcuffs at the time of the consent; that multiple officers were present or had their guns drawn; or that law enforcement apprised a defendant of certain advantages of providing consent. *See, e.g., United States v. Snype,* 441 F.3d 119, 131 (2d Cir. 2006) (finding consent voluntary where apartment of defendant's girlfriend was forcibly entered by SWAT team, defendant and girlfriend were initially handcuffed, and law enforcement agents raised the possibility that they would take the

two into custody and place the girlfriend's young daughter in protective custody); *United States v. Ansaldi,* 372 F.3d 118, 129 (2d Cir. 2004) (consent to search valid where defendant was arrested by five or six officers who had previously pulled their guns and placed the defendant in handcuffs); *United States v. Ceballos,* 812 F.2d 42, 51 (2d Cir. 1987) (consent to search was voluntary where defendant forcibly arrested, given *Miranda* warnings, questioned for period of hours, told that the agents would obtain a search warrant if consent was not given, and offered low bail and help in retaining job before giving consent).

The government must show that consent was voluntary by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n. 14 (1974); *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir. 1983). However, a defendant seeking a hearing bears the burden of demonstrating—typically through an affidavit filed by a person with first-hand knowledge—that there are material facts in dispute, which, if proven through a hearing, would require the granting of relief. *United States v. Warren*, 453 F.2d 738, 743 (2d Cir. 1972); *United States v. Culotta*, 413 F.2d 1343, 1345-46 (2d Cir. 1969).

Here, the Court concludes that Merced voluntarily consented to a search of his person. There is no evidence that Merced was handcuffed or threatened with force or arrest; nor is there evidence that DEA agents drew their weapons or otherwise pressured or coerced Merced into consenting. While agents did tell Merced that compliance with a search would save him time, the Second Circuit has made clear that informing a defendant of the advantages of consent is insufficient to vitiate voluntariness. *See Snype*, 441 F.3d at 131; *Ceballos,* 812 F.2d at 51. Even so, when told a search would save him time, Merced still did not consent. Doc. 50-6. In fact, according to the investigation report, Merced, having previously refused to be searched, only consented to the search after being persuaded by White, not be DEA agents. Doc. 50-6.

32

According to the report, White told Merced "go ahead and let him search you so we can get on the plane." *Id.* At this point, Merced held his arms up and away from his body and said, "Okay." *Id.* In other words, there is no evidence in the record suggesting that Merced consented to the search because of law enforcement coercion; instead, the record suggests Merced consented because White encouraged him to do so. *Id.*

These circumstances are not indicative of impermissible coercion. *See, e.g.*, *United States v. Gomez*, 199 F. Supp. 3d 728, 746 (S.D.N.Y. 2016) (finding consent to search voluntary where the defendant, who interacted with a single trooper, "was not placed in handcuffs or restrained in any other way; was not told that he was under arrest; was not subjected to a show of force; was not threatened in any way; and was not told that he was not free to go"). Indeed, courts have held that defendants voluntarily consented to searches under circumstances that were arguably more coercive in nature. *See, e.g.*, *Ceballos*, 812 F.2d at 51 (consent to search not involuntary where a handcuffed defendant was questioned for "a couple of hours" at a Secret Service field office); *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988) (consent to search not involuntary where defendant was detained for five hours, strip-searched, and interrogated); *United States v. Ansaldi,* 372 F.3d 118, 129 (2d Cir. 2004) (holding that the use of guns to effectuate arrest and handcuffing of defendant did not render his consent involuntary).

Because law enforcement officers did not illegally detain Merced, and because Merced voluntarily consented to a search of his person, neither the search nor the seizure violated the Fourth Amendment, and Merced's motion to suppress the evidence obtained as a result of the search and seizure is denied.

Ordinarily, a court must hold an evidentiary hearing on a motion to suppress if the moving papers are "sufficiently definite specific, detailed, and nonconjectural to enable the court

33

to conclude that contested issues of fact going to the validity of the search are in question." *Durand*, 767 F.App'x at 87 (internal citations and quotation marks omitted). This must be shown "by an affidavit of someone with personal knowledge of the underlying facts" which establish that "disputed issues of material fact exist." *Viscioso*, 711 F. Supp. at 745 (S.D.N.Y. 1989) (internal citations and quotation marks omitted). An evidentiary hearing will not be required "if the defendant's statements are general, conclusory or based on conjecture." *Id.* Courts in this district "have broad discretion when deciding whether or not to hold a suppression hearing." *Shamsideem*, 2004 WL 1179305, at *9. As Merced has not submitted an affidavit in support of his motion to suppress, and as he has not shown with sufficient specificity that the facts in the DEA investigation report are in dispute, an evidentiary hearing on Merced's motion to suppress is unnecessary.

## VI.    CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is DENIED, both motions to sever are DENIED, Skinner's motion to suppress is DENIED, and Merced's motion to suppress is DENIED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 49, 51, 52, 55, and 63.

It is SO ORDERED.


Dated:    November 30, 2021
          New York, New York

_____
                    EDGARDO RAMOS, U.S.D.J.